UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FAGAN HOLDINGS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2388 |
| | § | |
| THINKWARE, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is the motion for summary judgment of Defendant Thinkware, Inc. (Doc. No. 17). For the following reasons, Defendant's Motion must be granted in part and denied in part.

## I.      FACTUAL BACKGROUND

Plaintiff Fagan Holdings, Inc.'s ("Fagan") purchase of a license to use Defendant Thinkware Inc.'s software and its subsequent software implementation are the basis for this suit for breach of contract, fraudulent misrepresentation, and negligent misrepresentation.[1]

Fagan is a holding company that owns and operates several staff leasing companies. (Affidavit of Michael Todd Fagan ("Fagan Aff.") at ¶ 2.) Staff leasing companies, which are also known as professional employer organizations ("PEO"), provide client companies with payroll, human resources, benefits, and workers' compensation services. (*Id.*) In order to carry out these services, Fagan uses a software system. (*Id.*) Fagan had been using a DOS-based software system called "Summit" for approximately fourteen years, before deciding in 2006 to upgrade its software. (*Id.*; Deposition of Michael Fagan ("Fagan Depo.") at 12:19-22, 13:12-14.)

---

[1] These facts are undisputed except where noted.

Thinkware is a software company that produces and licenses software called Darwin (the "Software") to PEOs. (Affidavit of Kevin Eickmann ("Eickmann Aff.") at ¶ 2.) Darwin enables PEOs to provide payroll, invoicing, finance, reporting, human resources, and other functions to their clients. (*Id.*) Fagan learned of Thinkware's software and began exchanging emails with a Thinkware salesperson, Tom Allen, to obtain a demonstration of the Software. (Fagan Depo. at 18:6-13.) Mr. Allen eventually conducted a remote demonstration of the Software via telephone and computer for a few of Fagan's employees. (*Id.* at 18:14-19:1.) A few months after the first demonstration, Mr. Allen conducted a second remote demonstration of the Software for about fifteen of Fagan's managers. (*Id.* at 20:20-22:4.) A few weeks later, Mr. Allen conducted a third demonstration in-person at Fagan's offices with the same set of Fagan employees. (*Id.* at 22:11-24:12.)

While Fagan was receiving demonstrations of the Darwin Software, it was also considering and receiving demonstrations from other software companies offering similar products. (*Id.* at 22:20-23:12.) Fagan ultimately decided to license the Software based on certain features of Darwin that would make Fagan's benefits process easier. (*Id.* at 25:2-10.) In addition, Fagan allegedly relied on representations made by Mr. Allen during the demonstrations that "Darwin was going to make our lives a whole lot easier and allow us to do a whole lot more for our clients." (*Id*. at 25:11-19.) On June 13, 2008, Fagan and Thinkware entered into an End-User License Agreement (the "License Agreement"), and Fagan delivered a check in the amount of $220,000.00 to Thinkware in exchange for the Software license. (Fagan Aff. at ¶ 3.)

Fagan and Thinkware subsequently began implementation of the Software in stages. (Fagan Aff. at ¶ 4.; Fagan Depo. at 27:19-25.) A Thinkware customer service representative, SueMcVay, visited Fagan several times to devise a timeline for the conversion of Fagan's data

from the Summit software to the Darwin software and to provide training on the latter. (Fagan Depo. at 30:8-31:9, 57:4-5.) Fagan designated its own employee, Tonya Briese, as a project leader for the conversion process due to her experience in payroll administration and the prior implementation of Summit software years earlier. (*Id.* at 31:22-32:10.)

The Software implementation did not go smoothly. Fagan encountered a multitude of problems with various aspects of the Software and its features. Thinkware attempted to address these problems by providing telephone customer support and the services of Ms. McVay. (Eickmann Aff. at ¶ 5.) Thinkware also offered to design custom enhancements or changes to accommodate Fagan's desire for certain features. (Doc. 18, Exh. A.) Dissatisfied with these attempts, Fagan's President, Michael Fagan, wrote to Thinkware's Vice President, Kevin Eickmann, on October 17, 2008 with a list of approximately thirty-five various problems and deficiencies that Fagan believed the Darwin software possessed. (Doc. 18, Exh. A.) Thinkware designated an employee, Erin Martin, to oversee Fagan's implementation process. (Doc. 18, Exh. B.) On November 13, 2008, Mr. Fagan sent a list of approximately thirty problems with Darwin to Ms. Martin. (*Id.*) Fagan and Thinkware continued to work towards resolution of these problems. On January 21, 2008, Erin Martin wrote to Fagan and conveyed information about several prospective software releases and updates that Thinkware believed would resolve Fagan's problems. (Doc. 18, Exh. C.) Fagan did not respond and, on April 13, 2009, Fagan's counsel wrote to Thinkware and formally terminated the License Agreement. (Doc. 18, Exh. D.) Thereafter, Fagan filed suit against Thinkware in Montgomery County, Texas and alleged that Thinkware's sale of Darwin and the subsequent problems with the Software constituted negligent misrepresentation, fraudulent inducement and fraudulent misrepresentation, and breach of contract. Thinkware removed the lawsuit to this Court on the basis of diversity jurisdiction.

## II.    CHOICE OF LAW

Defendant has moved for application of Ohio law to both Plaintiff's breach of contract and tort claims. Plaintiff has objected to the application of Ohio law to its tort claims, and argues that Texas law should govern. District courts sitting in diversity apply the choice-of-law rules of the forum state. *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). Texas courts use the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws (1971) for all choice-of-law cases except contract cases in which the parties have agreed to a valid choice of law clause. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004).

For contracts with choice of law clauses, Texas courts apply section 187 of the Restatement to determine whether the choice of law clause is enforceable.[2] *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990). Generally, courts apply the parties' choice of law provided the law of the chosen state bears some reasonable relationship to the parties and the transaction. *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 824 (Tex. App. Dallas 2010). Here, the License Agreement contained a choice of law provision requiring Ohio law to be applied to construction and interpretation of the agreement. (Fagan Depo., Exh. A at ¶ 17.) Plaintiff does not dispute the validity of the choice-of-law provision.  The issue presented—

---

[2] Section 187 states:
   Law of the State Chosen by the Parties
   (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
   (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
   (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or
   (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
   (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.
RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 187 (1971).

whether the performance of Thinkware's product and Thinkware's customer service constituted a breach of the License Agreement—can be resolved through reference to explicit provisions of the License Agreement. Therefore, Ohio law should govern the breach of contract claim under Section 187(1) of the Restatement. Even if the issue is not one that can be resolved by an explicit provision in the License Agreement, application of Ohio law is still appropriate under Section 187(2) of the Restatement. Ohio bears a relationship to the parties and the transaction because Thinkware is headquartered and all its employees work in Ohio. Thinkware provided at least two demonstrations to Fagan via remote link from Ohio. Thinkware provided some of its customer support while its representatives were in Ohio. In addition, as Texas and Ohio have adopted the same UCC provision governing breach of contracts, application of Ohio law would not be contrary to the fundamental policy of either Texas or Ohio. *Compare* Tex. Bus. & Com. Code § 2.711(a) *with* Ohio R.C. § 1302.85.

However, the choice of law provision in the License Agreement does not cover Plaintiff's tort claims of negligent and fraudulent misrepresentation. The License Agreement's provision is a narrow one, addressing only the construction and interpretation of the agreement itself, rather than a broad provision purporting to "govern, construe and enforce all of the rights and duties of the parties arising from or relating in any way to the subject matter of this contract." *Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990). Therefore, the Court must return to Texas choice-of-law principles, which require, in tort cases, the use of the "most significant relationship" test provided by the Restatement (Second) Conflict of Laws. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000); *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979); RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145 (1971). Section 148 of the Restatement outlines several factors that should be taken into account when resolving choice of

5

law issues presented in fraud or misrepresentation cases.[3] As a Texas court construing these

factors has summarized: "When the plaintiff acted in reliance upon the defendant's

representations in a single state, this state will usually be the state of the applicable law, with

respect to most issues, if (a) the defendant's representations were received by the plaintiff in this

state, or (b) this state is the state of the plaintiff's domicile or principal place of business, or (c)

this state is the situs of the land which constituted the subject of the transaction between the

plaintiff and the defendant, or (d) this state is the place where the plaintiff was to render at least

the great bulk of his performance under his contract with the defendant." *Tracker Marine, L.P. v.

Ogle*, 108 S.W.3d 349, 356 (Tex. App. Houston 14th Dist. 2003—no pet.).

    Application of the Restatement factors in § 148 to the facts presented demands the use of

Texas law with respect to Plaintiff's tort claims. Fagan acted in reliance on Mr. Allen's alleged

misrepresentations in Texas. Fagan received Mr. Allen's alleged misrepresentations during the

demonstrations conducted while Fagan's employees were in its Texas offices. Fagan rendered its

performance under the License Agreement—delivery of the license fee—from its Texas office.

Despite Thinkware's business headquarters in Ohio, Fagan's residence in Texas is more

---

[3] "(1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
 (2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
        (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
        (b) the place where the plaintiff received the representations,
        (c) the place where the defendant made the representations,
        (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
        (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
        (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant."
RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 148 (1971).

important because the "the financial loss involved will usually be of greatest concern" where the plaintiff's business is located. *Tracker Marine, L.P.*, 108 S.W.3d at 356 (citing Restatement (Second) of Conflicts of Law § 148 cmt.i at 448). The facts presented to the Court do not reveal whether Mr. Allen made his alleged misrepresentations during his in-person demonstration at Fagan's offices in Texas or the remote demonstrations.[4] Regardless of where Mr. Allen made the representations, this factor is outweighed by the place where Fagan relied on the representations (Texas). *See id.* (citing Restatement (Second) of Conflicts of Law § 148 cmt. g at 447-48). The location of the Software at the time Mr. Allen made the representations (Ohio) is not sufficient to overcome the other factors that point towards the application of Texas law.

Therefore, the Court will apply Ohio law to Plaintiff's breach of contract claim and Texas law to Plaintiff's tort claims of fraudulent and negligent misrepresentation. *See Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp. 2d 712, 715 n.1 (S.D. Tex. 2000) (applying Texas law to plaintiff's tort claims and Tennessee law to plaintiff's breach of contract and breach of warranty claims).

## III.   SUMMARY JUDGMENT

### A.  Legal Standard for Summary Judgment

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could

---

[4] Thinkware claims that the alleged conduct causing injury occurred in Ohio, while Fagan asserts that the fraudulent statements were made in Texas. Neither side has provided a citation to the evidence to support their respective assertions and the Court cannot find evidence in the summary judgment record providing a definitive answer.

enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp*., 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id*. Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *see, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)).

### B. Application

#### 1.    Breach of Contract

In order to prevail on a breach of contract claim under Ohio law, a plaintiff must present evidence of existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *Doner v. Snapp*, 98 Ohio App. 3d 597, 600 (Ohio Ct. App., Miami County 1994). In its original petition, Plaintiff described one of its causes of action as "breach of contract," arising from Thinkware's failure to perform its obligations under the License Agreement. Specifically, Plaintiff alleged that the Software failed to perform as promised and Thinkware did not provide adequate customer support, rendering the Software useless for Plaintiff's business. Plaintiff subsequently stated, in response to Thinkware's First Set of Interrogatories, that it believed Thinkware to have breached the following sections of the License Agreement: (1) section 6(a), product support services; (2) section 12(a), ThinkWare's limited warranties; and (3) section 24(a), indemnification. (Fagan Depo., Exh. B at 16.)

Defendant seeks summary judgment as to all of Plaintiff's bases for a breach of contract. The Court will review each one in turn, below.

### a. Breach of Warranty or Contract

Defendant argues that Plaintiff's claim for breach of contract is essentially a breach of warranty claim that is foreclosed under section 12(a) of the License Agreement. Plaintiff contends that it has pled a breach of contract claim distinct from a breach of warranty claim.

It is true that a breach of contract claim is distinct from a breach of warranty claim. *See Mead Corp. v. ABB Power Generation Inc.*, 319 F.3d 790, 795 (2003) (interpreting Ohio law to provide for distinct causes of action of breach of contract and breach of warranty). A breach of warranty occurs when a buyer has accepted goods and given appropriate notice of the breach. Ohio R.C. Ann. § 1302.88 (adopting UCC § 2-714). The official comment to UCC § 2-714 states that remedies for a breach of warranty are availably only after the goods have been accepted by the buyer and the time for revocation of acceptance has gone by. UCC § 2-714 cmt. 1. In contrast, a breach of contract claim is triggered when a buyer "rightfully rejects or justifiably revokes" acceptance of the goods. *See* Ohio R.C. Ann. § 1302.85 (adopting UCC § 2-711). Thus, the availability of a breach of contract claim depends on whether Plaintiff finally accepted the software, or whether Plaintiff rejected or revoked acceptance of the Software.

Acceptance of goods occurs when a buyer, after a reasonable opportunity to inspect the goods, indicates to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity. Ohio R.C. Ann. § 1302.64(A)(1) (adopting UCC § 2-606). Rejection of goods results when a buyer does not accept the goods within a reasonable time after their delivery or tender. Ohio R.C. Ann. § 1302.61(A) (adopting UCC §§ 2-603, 2-604). A buyer may revoke acceptance when the good's nonconformity substantially impairs its value to him, if

the buyer's acceptance was made on the reasonable assumption that the non-conformity would be cured and it has not been, or without discovery of the non-conformity if acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. Ohio R.C. Ann. § 1302.66(A) (adopting UCC § 2-608). Revocation must be made within a reasonable time of the discovery of the non-conformity and the buyer must notify the seller of the non-conformity. *Id.* § 1302.66(B).

As Defendant correctly points out, the predicate for Plaintiff to revoke acceptance of the License Agreement and claim remedies for breach of contract is a finding that the Darwin software was non-conforming. "A determination of the existence or non-existence of a nonconformity requires reference to the terms of the contract, including the law of warranty." *Cannon v. Neal Walker Leasing*, 1995 Ohio App. LEXIS 2839, *7-*8 (Ohio Ct. App., Summit County 1995). Goods conform to a contract "if they are in accordance with the obligations under a contract." Ohio R.C. Ann. § 1302.01(A)(12). A contract encompasses both the express terms of the written agreement as well as other obligations implied from the parties' course of dealing. Ohio R.C. Ann. § 1301.1(C). If a written contract contains an effective disclaimer of all express and implied warranties, the seller owes the buyer no obligation relating to the quality of the goods. Ohio R.C. Ann. § 1302.29 cmt. 7.

Although the License Agreement contained an effective disclaimer of implied warranties, it did not contain an effective disclaimer of express warranties. Section 12(c) of the License Agreement disclaims all implied warranties and uses the words "merchantability," "fitness," and "fitness for a particular purpose" in capital letters. *See* Ohio R.C. Ann. § 1301.01(J) (defining "conspicuousness" as including language in the body of a contract that is in larger or contrasting type). Further, the provision states in capital letters that the "entire risk as to the quality and

performance of the software is with Customer. The Software is provided as is." (*Id.*) Under §

1302.29, the License Agreement's disclaimer of implied warranties is effective. *See Norcold,*

*Inc. v. Gateway Supply Co.*, 2006 Ohio 6919, *51 (Ohio Ct. App., Shelby County 2006).

However, the License Agreement does not disclaim *all* express warranties. "[T]he fact that a

seller makes certain promises to a buyer at the time of a sale does not mean that the exclusion of

warranties in an 'as is' clause is meaningless. Instead, the phrase 'as is' excludes all warranties

except those expressly made to the buyer." *Perkins v. Land Rover*, 2003 Ohio 6722, P19 (Ohio

Ct. App., Mahoning County Dec. 5, 2003). Here, the License Agreement provides an express

warranty in the form of the limited warranty contained in section 12(a) and leaves open the

possibility that express warranties arose out of representations made to Plaintiff during the

Software demonstrations.

Plaintiff may revoke the License Agreement if Thinkware's or Mr. Allen's oral

representations during the demonstrations about the performance of the Software constituted an

express warranty. "Whenever any affirmation of fact or promise relating to the goods becomes

part of the basis for the bargain between parties, an express warranty is created by the seller."

*Barksdale v. Van's Auto Sales, Inc.*, 62 Ohio App. 3d 724, 728 (Ohio Ct. App., Cuyahoga

County 1989) (quoting Ohio R.C. Ann. § 1302.26(A)(1)) Oral representations creating express

warranties are not excluded under the parol evidence rule because "in situations where express

warranties are made during the bargain, but then allegedly disclaimed in the actual sales contract,

preference is to be given to the express warranties and inconsistent disclaimers are inoperative to

the extent they are unreasonable." *Barksdale*, 62 Ohio App. 3d at 728 (quoting Ohio R.C. Ann. §

1302.29(A)) Even if a written agreement was intended by the parties to be a final expression of

their agreement, a plaintiff may present "evidence of a contemporaneous oral agreement when

that agreement was made in order to induce the party into entering the written contract."
*Stormont v. Tenn-River Trading Co.*, 1995 Ohio App. LEXIS 1759, *9 (Ohio Ct. App., Franklin County 1995). Defendant Thinkware cites several cases for the proposition that evidence of prior or contemporaneous negotiations relating to the final terms of a written agreement are to be excluded when the parties integrated their negotiations into a final and unambiguous written agreement. However, most of these cases involve claims of fraudulent inducement rather than breach of contract. The one case that does directly address a breach of contract case, *Keel v. Toledo Harley-Davidson/Buell*, 184 Ohio App. 3d 348, 352 (Ohio Ct. App., Lucas County 2009), involves an oral statement that a motorcycle was "reliable, dependable, and had no defects" that was later superseded by a written agreement containing a merger clause and disclaimed all express and implied warranties. However, the purported warranties in *Keel* can be distinguished as mere "puffing" rather than specific factual representations that may give rise to an express warranty. *See Gallagher v. WMK Inc.*, 2007 Ohio 6615, *20 (Ohio Ct. App., Summit County 2007) ("[T]he specificity of the comment and the context in which it was made will impact the determination of whether a statement falls into the category of 'puffing' versus affirmation of fact.").

Plaintiff asserts that Thinkware made certain oral representations about the capability and performance of the Software during the demonstrations. For example, Thinkware allegedly told Fagan that Darwin had the capability to override or change taxes within a payroll. (Fagan Depo., Exh. B at 15.) Fagan also claims that Thinkware represented that child support deductions could be filed electronically. (Fagan Depo., Exh. B at 19.) These statements go beyond "mere puffing" by Mr. Allen and constitute specific factual representations about the qualities of the Software during a situation in which Fagan could be expected to receive specific representations about

what the Software could do. Further, there is evidence that these statements formed the basis of

Fagan's decision to enter into the License Agreement with Thinkware. (Fagan Depo. at 24:23-

25:19.) Therefore, there are genuine issues of material fact about the oral representations made

about the Software's capabilities and performance that may be inconsistent with the License

Agreement's limited express warranty that the Software would perform only in accordance with

the accompanying materials (the User Guide and the Getting Started Guide). To the extent that

the License Agreement's contractual disclaimer of express warranties is inconsistent with

Thinkware's oral express warranties, the oral express warranties may control and the inconsistent

written provisions may be deemed inoperative to the extent they are unreasonable.

Since there are genuine issues of material fact regarding the oral express warranties made

to Fagan during the Software demonstrations, the Software's conformity or non-conformity

cannot be conclusively resolved in favor of ThinkWare. If the Software is found to be non-

conforming, Plaintiff is able to revoke acceptance of the Software and bring a claim for breach of

contract that is not foreclosed by any disclaimers preventing breach of warranty claims. In

addition, there are genuine issues of material fact as to whether the value of the Software was

substantially impaired. Mr. Fagan states that he had to return the Software to Thinkware once it

became clear that the Software could not be used. (Fagan Aff. at ¶ 6.) "[O]nce it is established

that an item is non-conforming, the issue becomes whether that non-conformity substantially

impaired its value to the buyer." *Cannon v. Neal Walker Leasing*, 1995 Ohio App. LEXIS 2839,

*8 (Ohio Ct. App., Summit County 1995). "Whether a complained of nonconformity

substantially impairs an item's worth to the buyer is a determination exclusively within the

purview of the fact-finder and must be based on objective evidence of the buyer's idiosyncratic

tastes and needs." *McCullough v. Bill Swad Chrysler-Plymouth, Inc.*, 5 Ohio St. 3d 181, 186

(Ohio 1983). Finally, there are genuine issues of material fact exist as to the question of whether Plaintiff's revocation of its acceptance occurred within a "reasonable" time. Mr. Fagan states that he worked with Thinkware through January 2009, at which time Fagan realized that the Software's failure to perform according to Thinkware's representations could not be cured. Fagan terminated the License Agreement approximately four months later. (Fagan Aff. at ¶¶ 4-6.) As a result of these factual issues, Defendant is not entitled to summary judgment on Plaintiff's breach of contract claim.

### b.  Section 6(a) of the License Agreement – Product Support Services

Defendant argues that there is no evidence to support Plaintiff's claims that it breached section 6(a) of the License Agreement, which covers customer support services. Plaintiff alleges that each of the thirty or so complaints listed in Mr. Fagan's emails to Thinkware constitutes an instance where a Thinkware customer service representative failed to provide adequate service in violation of section 6(a). (Fagan Depo. at 52:8-23, 53:17-54:1.) However, Fagan's complaints about the Software do not specify how Thinkware's customer service representatives failed to provide "product support services  . . . pursuant to Thinkware's policies and programs described in the Software documentation, on ThinkWare's support website, or other ThinkWare-provided materials . . . ." (Fagan Depo., Exh. A at ¶ 6(a).) In fact, the summary judgment evidence shows that ThinkWare's customer representatives expended time and effort in working with Fagan to address Fagan's issues with the Software. Without more than conclusory allegations that ThinkWare failed to provide the required customer service under the License Agreement, Plaintiff's claim fails. Defendant is entitled to summary judgment on Plaintiff's claim of breach of section 6(a) of the License Agreement.

### c.  Section 24(a) of the License Agreement – Indemnification

Plaintiff asserted in its response to Thinkware's First Set of Interrogatories that Thinkware breached section 24(a) of the License Agreement, in which Thinkware agrees to indemnify Fagan.[5] (Fagan Depo., Exh. B at 7.) Fagan's claim for indemnification is based upon an interpretation of the clause that requires Thinkware to "indemnify [Fagan] from any and all losses that have arisen from the acts or omissions of ThinkWare," in the form of the license and customer support fees paid by Fagan to Thinkware. (Fagan Depo. at 54:8-21.) Defendant argues that the indemnification clause has not been triggered, much less breached, because Fagan has not incurred a loss to a third party. *See Krasny-Kaplan Corp. v. Flo-Tork, Inc.*, 66 Ohio St. 3d 75, 78 (Ohio 1993) ("The concept of indemnity embraces aspects of primary and secondary liability. Indemnification occurs when one who is primarily liable is required to reimburse another who has discharged a liability for which that other is only secondarily liable.").

Section 24(a) does not explicitly limit its application to third party claims. *See Mead*, 319 F.3d at 798. Thinkware agrees to indemnify Fagan from "any and all . . . losses, damages, costs and expenses . . . from, or alleged to have arise[n] from the acts or omissions (whether negligent, reckless, intentional, or otherwise) of Thinkware." (Fagan Depo., Exh. A at ¶ 24(a).) The language can be interpreted as requiring Thinkware to compensate Fagan for Fagan's losses linked to the failure of Thinkware's Software to perform as Fagan wished. The License Agreement does not contain language purporting to limit the indemnification to claims, liabilities, or damages of third-parties.

Contrary to Defendant's argument, indemnity does not apply solely to third-party situations. "The typical meaning of 'indemnify' is akin to 'reimburse' rather than 'reimburse for

---

[5] Section 24(a) states: "Thinkware shall defend, indemnify and hold harmless Customer and its directors, officers, employees, shareholders and agents, from and against any and all suits, claims, actions, liabilities, losses, damages, costs and expenses (including, but not limited to, interest, penalties, reasonable attorneys' fees and other expenses of litigation) and causes of action of whatsoever kind from, or alleged to have arise [sic] from the acts or omissions (whether negligent, reckless, intentional, or otherwise) of Thinkware." (Fagan Depo., Exh. A at ¶ 24(a).)

losses incurred by third parties.'" *See Battelle Memorial Institute v. Nowsco Pipeline Svcs., Inc.*, 56 F. Supp. 2d 944, 950 (S.D. Oh. 1999) (citing Black's Law Dictionary 529 (6th ed. 1991)). Indemnification may comprise both losses to contracting parties as well as losses to third-parties. *Id.* The Supreme Court of Ohio has defined indemnity as arising "from contract, express or implied, and is a right of a person who has been compelled to pay what another should pay in full to require complete reimbursement." *Travelers Indem. Co. v. Trowbridge*, 41 Ohio St. 2d 11, 13-14 (Ohio 1975), *overruled on other grounds by Motorists Mut. Ins. Co. v. Huron Rd. Hosp.*, 73 Ohio St. 3d 391 (Ohio 1995). Defendants cite to no case that expressly limits the principle of indemnification to third-party damages. Further, there is no other contractual provision in the License Agreement referring to third-party claims that could be used to narrow the scope of section 24(a). *See Mead*, 319 F.3d at 798 (holding that a contract's indemnification clause, which did not contain an express limitation to third-party claims, should be read in conjunction with a separate contract clause that stated that a party's liability for third-party claims should be limited to indemnification). Absent an express limitation on the indemnification clause to third-party damage, the clause may apply to damages suffered by Fagan and Thinkware themselves. *See Battelle*, 56 F. Supp. 2d at 952. This interpretation conforms to the intent of the parties, as expressed in the clear and unambiguous terms of the contract. *Portsmouth Ins. Agency v. Medical Mut. of Ohio*, 2009 Ohio 941, *18 (Ohio Ct. App., Scioto County 2009).

With respect to the factual determination of whether Fagan is entitled to indemnification under section 24(a), we find that a genuine issue of material fact exists as to whether Fagan's losses arose from the acts or omissions of Thinkware. Fagan has specified instances in which the Software failed to perform as Thinkware represented it would during the Software demonstrations. Fagan also has identified its losses in the form of the license fee paid to

Thinkware and additional customer service fees it incurred during the Software implementation. These facts are sufficient to defeat Thinkware's request for summary judgment on Plaintiff's claim of indemnification.

### 2.  Fraudulent Misrepresentation

Defendant Thinkware moves for summary judgment on Plaintiff's claim of fraudulent misrepresentation. Plaintiff alleges that Thinkware made fraudulent misrepresentations through the statements of Mr. Allen that "Darwin was going to make our lives a whole lot easier and allow us to do a whole lot more for our clients." (Fagan Depo. at 25:11-19.)

To prevail on a fraud claim, a plaintiff must prove that: (1) the defendant made a material representation that was false; (2) it knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) it intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and thereby suffered injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (quoting *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983)).

Fagan has not pointed to any evidence that Thinkware or Mr. Allen knew that any purported misrepresentations were either false at the time they were made or were made recklessly. Even if Fagan could show that Defendant Thinkware or Mr. Allen possessed the requisite knowledge, Mr. Allen's statements were puffery rather than representations of fact. *See Dowling v. NADW Marketing, Inc.*, 631 S.W.2d 726, 729 (Tex. 1982) (citing *Gulf Oil Corp. v. Federal Trade Comm'n*, 150 F.2d 106, 109 (5th Cir. 1945)) ("Puffery is an expression of opinion by a seller not made as a representation of fact."). Finally, Plaintiff has not presented any evidence that Mr. Allen was making statements on topics on which it could not have been expected, in the exercise of ordinary diligence, to have formed its own opinion. *See United States*

*Pipe & Foundry Co. v. City of Waco*, 100 S.W.2d 1099, 1101 (Tex. App. 1936) (stating that the decisive test of whether a representation is an opinion or fact is whether "the seller assumes to assert a fact of which the buyer is ignorant, or whether he merely declares his belief with reference to a matter on which he has no special knowledge and on which the buyer may be expected also to have an opinion, and to exercise his judgment . . . ."). Mr. Allen's claim that the Software would make Fagan's business easier and allow them to serve their clients better is an opinion on which Fagan would be expected to exercise its own judgment after receiving all of the Software demonstrations. As such, Fagan cannot rely on Mr. Allen's statements as representations of fact.

Therefore, Defendant Thinkware is entitled to summary judgment on Plaintiff's claim of fraudulent misrepresentation.

### 3. Negligent Misrepresentation

Plaintiff has agreed to summary judgment on its claim of negligent misrepresentation because it is no longer pursuing this claim. Therefore, the Court grants summary judgment to Defendant on Plaintiff's negligent misrepresentation claim.

## IV.    CONCLUSION

Defendant Thinkware's Motion for Summary Judgment (Doc. No. 17) is **GRANTED IN PART** and **DENIED IN PART.**  Plaintiff's claims of fraudulent misrepresentation, negligent misrepresentation, and breach of Section 6(a) of the License Agreement are **DISMISSED.**

**IT IS SO ORDERED**.

**SIGNED** this 2nd day of November, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE